**TOWNSHIP OF PISCATAWAY, Edwin Markano, et al., Plaintiffs,**

v.

**DUKE ENERGY and Texas Eastern Transmission Corp., Defendants.**

**Civil Action No. 01–4828(FSH).**

United States District Court, D. New Jersey.

Sept. 20, 2005.

Edward Sponzilli, Norris, McLaughlin & Marcus PA, Somerville, NJ, Steven D. Cahn, Cahn & Parra, LLC, Piscataway, NJ, for Plaintiffs.

Edwin C. Landis, Jr., William Hartley Schmidt, Jr., Meyner & Landis, Newark, NJ, for Defendants.

### OPINION & ORDER

HOCHBERG, District Judge.

This matter comes before the Court upon Plaintiffs' motion for summary judgment. The Court retains diversity jurisdiction under 28 U.S.C. 1332. The Court has reviewed the submissions of the parties and considers the motion on the papers pursuant to Fed.R.Civ.P. 78 together with pertinent portions of the oral argument on April 26, 2005.

### BACKGROUND

#### A.  Factual History[1]

Plaintiffs are individual residential homeowners, who reside on Fountain Av-

---

1.  As the parties did not include a statement of material facts with their submissions as required by Local Rule 56.1, the Court relies on the facts put forth in the Final Pretrial Order filed November 25, 2003. The Court also considers Defendants' expert report and the express additional facts set forth in the fact section of their respective briefs. "To the

enue, a one-block long street in the Township of Piscataway, New Jersey. Defendants are Duke Energy Operating Company, LLC (Duke Energy) and Texas Eastern Transmission, LP (Texas Eastern), both of which have principal places of business in Houston, Texas.

In 1944, Plaintiffs' predecessors-in-title granted Defense Plant Corporation an easement (1944 Right of Way Grant) to "lay, operate, renew, alter, inspect and maintain" two pipelines across property now owned by the Township of Piscataway. The grantee agreed to "bury such pipelines so that they will not interfere with the cultivation or drainage of the land, and also to pay any and all damages to stock, crops, fences, timber, and land which may be suffered from the construction, operation, renewal, alteration, inspection or maintenance of such pipelines." Pursuant to the 1944 Right of Way Grant, Defense Plant Corporation constructed two twenty-inch diameter pipelines across the property. Texas Eastern Transmission Corporation (TETCO), Defendant Texas Eastern's predecessor, subsequently acquired Defense Plant Corporation's rights under the 1944 Right of Way Grant and ownership of the two pipelines.

In 1960, Plaintiffs' predecessors-in-title granted TETCO an easement (1960 Right of Way Grant) to "construct, lay, maintain, operate, renew, alter, repair, remove, change the size of, and replace" pipelines across the property now owned by the Township of Piscataway. The grantee agreed to "bury all pipes to a sufficient depth so as not to interfere with cultivation of soil, and ... to pay such damages which may arise to growing crops, timber or fences from the construction, maintenance and operation of said lines." Pursuant to the 1960 Right of Way Grant, TETCO constructed a third thirty-six inch diameter pipeline across the property.

In or about 1963, TETCO agreed to modify and reduce the size of the easement described in the 1944 Right of Way Grant and the 1960 Right of Way Grant and defined such reduced easement by a metes and bounds description found in an instrument (1963 Right of Way Instrument) executed by TETCO. All of the rights and conditions as set forth in the 1944 and 1960 Right of Way Grants remained intact. The purpose of the 1963 Right of Way Instrument was to convey title to JMS Construction Company for residential development of the area. The London Plane Trees, some of the trees in dispute, were planted along the residential street soon after conveyance of title with the undisputed knowledge of Defendants. They have grown to a height of up to 75 feet and a diameter of up to 27 inches.

Texas Eastern, as successor in interest to TETCO, owns the easement created by the 1944 Right of Way Grant, 1960 Right of Way Grant, and 1963 Right of Way Instrument (collectively "Easement") as well as the three pipelines in question. The Easement gives Defendants the express power to, *inter alia,* "operate," "in-

extent that the lack of a Statement of Undisputed Facts has hampered this process [of reviewing the record and materials submitted], any complaint that some piece of evidence was overlooked, for example in a motion for reconsideration, is attenuated." *Bowers v. NCAA,* 9 F.Supp.2d 460, 476 (D.N.J. 1998); *see also Comose v. N.J. Transit Rail Operations,* 2000 U.S. Dist. LEXIS 20790, 2000 WL 33258658 (D.N.J.2000) ("such [Rule 56.1] statements save this court from having to drudge through deposition transcripts, expert reports, and lengthy contracts to determine the facts"); *cf. Clawans v. United States,* 2000 WL 1887786, 2000 U.S. Dist. LEXIS 18808 (D.N.J. Dec. 26, 2000) ("failure to comply with the Local Civil Rule [56.1] would by itself suffice to deny [a party]'s motion for summary judgment"). The parties are advised to follow the Local Rules of Civil Procedure. This oversight is not the first.

spect," and "maintain" the pipelines. The Easement is on the property of the Township of Piscataway.

Duke Energy operates the pipelines and maintains the Easement in the transportation of natural gas in interstate commerce pursuant to certificates of public convenience and necessity issued by the Federal Energy Regulatory Commission (FERC), and is subject to regulation by FERC under the Natural Gas Act, 15 U.S.C. 717 and by the Department of Transportation. In order to comply with safety standards, Defendants must inspect the pipelines and be prepared to make repairs on an emergency basis, which they currently do. The regulations do not require any specific patrol pattern, nor do they require aerial surveillance or tree removal. Defendants' current Standard Operating Procedure (SOP) is to clear easement areas of trees so that Defendants may inspect the area by aerial and ground patrols in the way most convenient and efficient to Defendants.

Defendants conduct inspections of the Easement by air three times per week and regularly by ground. They utilize an underground device (called a "PIG" by Defendants) as part of their System Integrity Program that moves through the pipeline to inspect the pipeline itself. The last PIGs were sent through the pipelines in 2003 and 2004. No problems or irregularities have been reported based on these inspections.

The trees on Fountain Avenue have been steadily growing there for over forty years since the neighborhood was developed in the 1960s. In April 2000, Defendants notified Plaintiffs they would be removing trees, limbs, and foliage from the area of the Easement. Prior to then, Defendants had never asserted a legal right to remove the trees. Defendants' proposal for tree removal is to grind down the stumps after cutting the trees but leave the root structure in the ground. Defendants removed five trees from the Easement in March 2005 in this manner, pursuant to a Consent Order between the parties.

Defendants and Plaintiffs stipulated in the Final Pretrial Order, *inter alia*, that "R. Defendants inspect the pipelines by air and on the ground and are prepared to make repairs on an emergency basis," and "X. The defendants regularly monitor the section of the pipelines in question that run beneath Fountain Avenue through a device inserted into the pipeline. This device seeks to locate any damage or irregularity in the pipelines itself. No damage has been identified in the pipelines."

### B. Procedural History

In April 2000, Defendants first notified Plaintiffs that they would be removing the trees from Fountain Avenue. The parties met in May 2000 and September 2001 to discuss their positions but were unable to reach a compromise about the trees' removal.

On October 4, 2001, Plaintiffs, with the Township of Piscataway, commenced this action by filing a complaint in state court that included a motion for a preliminary injunction prohibiting Defendants from removing the trees. The next day, the Honorable Joseph C. Messina, J.S.C., heard the Plaintiffs' motion and granted the preliminary injunction. Judge Messina's Order provided that Defendants could move on two days notice to dissolve the preliminary injunction.

Rather than moving before Judge Messina, on October 16, 2001 Defendants removed the matter to the District of New Jersey, based on diversity jurisdiction. In March 2002, Defendants filed a motion seeking injunctive relief against Plaintiffs to permit the tree cutting. On March 14, 2002, the Honorable Alfred M. Wolin,

U.S.D.J, issued a memorandum opinion denying Defendants' motion and noting that "the preliminary injunction of Judge Messina remains in force."

One year later, on March 3, 2003, the Township of Piscataway settled with Defendants. The agreement stated that the settlement monies to the Township would be held in escrow until the balance of the litigation was resolved.[2] Despite proposals being suggested by Plaintiffs, this matter has not been settled as to their rights.

On February 9, 2005, the matter was transferred to this Court. At a hearing on April 26, 2005, the Court denied Plaintiffs' request for a jury trial, dismissed Plaintiffs' trespass claim, and held that Plaintiffs' had standing to pursue their remaining claims against Defendants. The Court called for motions and briefing.[3]

### STANDARD OF REVIEW

Pursuant to Fed.R.Civ.P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). All facts and inferences must be construed in the light most favorable to the nonmoving party. *Peters v. Delaware River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir.1994). The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990).

The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. *Id.* at 322–23, 106 S.Ct. 2548. This burden can be

---

**2.** Defendants stated an intention to immediately cut all 80 trees and from the Easement. After this settlement, Defendants agreed to instead immediately cut down 55 trees, leaving the remaining 25 trees until the trees grow to a size of eight inches or greater in diameter, or earlier if the trees interfere with aerial surveillance, maintenance activities, or the ability to expose a pipe in the event of an emergency in the judgment of Defendants.

**3.** The Court permitted Plaintiffs to make a motion to dismiss based on laches and for Defendants to make a 12(b)(6) motion to dismiss Plaintiff's claim of nuisance. Defen-

dants filed a 12(b)(6) motion on nuisance, and Plaintiffs filed for summary judgment on the issues of (a) laches, (b) whether Defendants had rights to remove trees under the easement given the easement's restriction that Defendants "will bury such pipes to a depth not to interfere with cultivation of the land," and (c) whether removal of the trees is reasonably necessary for Defendants to enjoy their easement rights to "maintain," "operate," or "repair" the pipelines. Defendants responded with a cross-motion for summary judgment on the same three issues and an additional argument that Plaintiffs' expert was not qualified.

"discharged by showing … that there is an absence of evidence to support the non-moving party's case." *Id.* Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the non-moving party must then demonstrate facts supporting each element for which it bears the burden, thus establishing the existence of a "genuine issue of material fact" justifying trial. *Miller*, 843 F.2d at 143; accord *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

## DISCUSSION

Plaintiffs assert three legal theories that would maintain the injunction issued by Judge Messina that currently prevents Defendants from cutting down Fountain Avenue's trees. First, Plaintiffs claim that the equitable principle of laches bars Defendants from removing the trees that Defendants acquiesced in planting and gave no notice of intent to remove for forty years. Second, Plaintiffs argue that restrictive language in the Easement precluding Defendants from interfering with "cultiva-

tion" of the land prevents Defendants from removing the trees. Third, Plaintiffs claim that in order for Defendants to enjoy their Easement, it is not reasonably necessary for Defendants to cut the trees down.

Because Defendants raise concerns over the safety of the community, the Court first addresses the central issue of whether it is reasonably necessary for Defendants to remove the trees from Fountain Avenue in order to enjoy their right under the Easement to "operate," "inspect," and "maintain" the pipelines, and promote the safety of the community.

### A. Reasonable Necessity of Removing the Trees

#### 1. *Legal Standard*

Under New Jersey law,[4] the owner of an easement may only do that which is "reasonably necessary" to enjoy the easement. *Tide–Water Pipe Company v. Blair Holding Company*, 42 N.J. 591, 202 A.2d 405 (1964) (stating that "in order that the easement use shall not unreasonably interfere with the use of, or increase the burden upon, the landowner … it shall be exercised … only in that way which is reasonably necessary for its full enjoyment"); *Hammett v. Rosensohn*, 26 N.J. 415, 425, 140 A.2d 377 (N.J.1958). Convenience of the easement holder is not sufficient for finding rights under the easement. *Tide–Water*, 42 N.J. 591 at 606, 202 A.2d 405 (stating that easement rights shall not be exercised "in a manner determined by mere convenience of the easement holder"); *Hammett*, 26 N.J. at 425, 140 A.2d 377 (holding that "the touchstone is necessity and not convenience"). Although the question of reasonable necessity versus convenience is generally a question of fact, *Tide–Water*, 42 N.J. 591 at

---

**4.** A federal court sitting in diversity applies the law of the state in which the federal court sits. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

608, 202 A.2d 405, the question is decided as a matter of law where the alleged facts at summary judgment or the facts found at trial compel a legal ruling. *See Columbia Gas Transmission Corporation v. Savage*, 863 F.Supp. 198 (M.D.Pa.1994) (granting summary judgment in favor of easement holder where the alleged facts showed that the servient landowner's proposed building would infringe on easement holder's rights reasonably necessary to enjoying the easement); *Hyland v. Fonda*, 44 N.J.Super. 180, 192, 129 A.2d 899 (reversing the trial court's decision in favor of the easement holder, after the trial court conducted extensive fact-finding, because the facts did not support the easement holder's position that his use of the easement was reasonably necessary to enjoy the granted easement rights) (App.Div.1957); *see also Texas Eastern Transmission LP v. Bowers III*, 65 Fed.Appx. 791 (3d Cir.2003) (stating that the Court determines reasonableness).

In *Hammett*, the easement holder sought to build a beach area along a pond under an easement that permitted the holder to use the pond "for boating, fishing, skating, ice-cutting, hunting, and bathing purposes." 26 N.J. at 423, 140 A.2d 377. The easement holder argued that his right to bathe reasonably necessitated doing so in shallow water, thus he had a right to fill the shore and create a beach area. *Id.* at 425, 140 A.2d 377. After first concluding that the easement clearly precluded the creation of a beach area such that it was not even necessary to consider the doctrine of reasonable necessity,[5] the New Jersey Supreme Court continued stating that "even if we were to ... hold that [the easement holder] might utilize the servient estate to the extent reasonably necessary to the enjoyment of their beneficial interest therein ... we would still not be persuaded that the contemplated fill is reasonably necessary." *Id.* The Court stated that the analysis required a showing of necessity rather than convenience and reasoned that in over 30 years no one on the property had found it necessary to construct a beach area in order to enjoy the bathing benefits of the pond and that the easement holders themselves had lived there for "some seven or eight years prior to their proposal to construct beach." *Id.*

The easement holder also argued that filling the shore was necessary to provide access to other areas of the pond's shore because the existing slope from the roadway to those points was too steep. *Id.* at 426, 140 A.2d 377. The Court rejected this argument for failure to consider less extreme alternatives, stating "the evidence in this case clearly indicates that gradual and adequate access to the present water line can be had by changing the grade of the roadway and adjacent land, a right which defendants have." *Id.* The court concluded that the easement holder's arguments, given the facts put forth, "have not met the burden of showing necessity for a fill with respect to access to the pond."

In *Hyland*, the easement allowed the holder "the right of ingress and egress for roadway purposes along a strip of 25 feet in width along the entire northerly boundary [of the servient estate] for roadway purposes." 44 N.J.Super. at 183, 129 A.2d 899. At trial, the easement holder testified that his path across the servient estate "became soft and muddy, 'deep ruts and holes appeared, and it was nearly im-

---

5. Because of restrictive language in the easement pertaining to, *e.g.*, the planting of hedges or the construction of buildings, the Court determined that "the provisions in the deed as a whole ring in restrictive tones. They do not have the fluidity and flexibility essential to the allowance of a transgression because of convenience or even reasonable necessity." *Id.* at 424, 140 A.2d 377.

passable.' "*Id.* at 185, 129 A.2d 899. Thus, the easement holder argued that paving the roadway was reasonably necessary. The trial court found facts and agreed with the easement holder that blacktopping the easement area was appropriate because "summer rains and winter storms continually cause ruts and holes to appear which require constant attention;" the Appellate Division reversed. *Id.* at 187, 191–92, 129 A.2d 899. The Appellate Division stated "with all deference to the thoughtful consideration given to this problem by the trial judge, we are unable to concur in his conclusion that blacktopping was a permissible repair in the present case." *Id.* at 191, 129 A.2d 899. The Court found decisive that the easement holder never attempted to repair the roadway rather than blacktopping it. *Id.* The easement holder "did not show such reasonable attempts to repair and use the roadway in its existing character, before undertaking to pave it." *Id.* at 192, 129 A.2d 899.

Defendants cite *Tide–Water*, wherein the New Jersey Supreme Court affirmed the trial court's ruling that it was reasonably necessary that the servient landowner be enjoined from constructing a building over two underground pipelines in order for the easement holder to enjoy its right "to construct, operate, repair, replace, maintain, and from time to time alter and remove the [pipeline] in such manner as [the easement holder] may desire." 42 N.J. at 597, 202 A.2d 405. The landowner sought to build a "large addition" to a building which would cover 90–feet of the pipelines and provide access to the pipelines only from the sides from 100 feet away. *Id.* at 597, 202 A.2d 405. The Court first noted the "substantially additional burden in time and money involved" if the pipeline company could not utilize "straight-down digging" but instead had to dig horizontally underground for many feet in order to get around the large structure. *Id.* at 607, 202 A.2d 405. Second, the Court stated that the easement language was broad and allowed for exercising the easement rights "in such manner as [the easement holder] may desire." [6] *Id.*

This Court also notes *Texas Eastern Transmission LP v. Bowers III*, 65 Fed. Appx. 791 (3d Cir.2003) (unpublished), where the easement holder (the same party as in this case) sought removal of a single tree from the easement area because the tree interfered with the easement holder's ability to perform emergency repair work or to utilize aerial surveillance to detect leaks in their pipeline running under the land. The easement language was similar to that of the present case, permitting the easement holder "to lay, operate, renew, alter, inspect, and maintain" the pipelines. *Texas Eastern*, 65 Fed.Appx. at 793. The Court affirmed the district court's ruling that removal of the tree was not necessary to repair the pipeline or for inspection because (a) emergency repairs could still be performed with the trees present, (b) the tree could be felled in an hour if necessary, (c) numerous alternative methods of inspection (besides aerial) were available, and (d) for years the easement holder had been able to effectively in-

---

**6.** Defendants also cite *Avery v. Colonial Pipeline Company*, 213 Ga.App. 388, 444 S.E.2d 363 (Ga.App.1994) and *Jakobsen v. Colonial Pipeline Company*, 260 Ga. 565, 397 S.E.2d 435 (1990), in which the easement holders were found to be in "probable violation" of Department of Transportation pipeline safety regulations because of the trees, and the easement language explicitly permitted the cutting of "timber" or "whatever may be requisite for the enjoyment of the rights" to "maintain, operate, alter, repair, remove and replace" the pipelines. In the case at bar, Defendants and Plaintiffs agree that no law or regulation requires removal of the trees from Fountain Avenue in order to be in safety compliance, and the Easement is far less broadly worded.

spect the easement area with the tree present. *Id.* at 794–96.

Both parties cross move for summary judgment based on the undisputed facts. Defendants assert that the trees must be removed for enjoyment of the Easement because (a) Defendants must be able to conduct aerial surveillance of the property, (b) the roots of the trees may reach down and damage the pipelines, and (c) the trees and roots may prevent access to the pipelines in the event of a leak or other emergency. Plaintiffs assert that surveillance of the pipelines can and has been for years done by air and land,[7] and that no showing of root damage or danger has been made. Neither party has adduced facts to show that any tree could not rapidly be cut in the event of a leak or other emergency.[8]

### 2. *Undisputed Facts*

#### a. *Aerial surveillance*

Defendants utilize aerial surveillance in order to observe property under which its pipelines lay. If the surrounding vegetation looks "distressed," it is a signal that the pipeline may have a leak. Defendants also routinely utilize vehicular land surveillance to observe the premises and have an office only a few miles away. Defendants state that aerial surveillance is "the most efficient means to perform this task" and is "the least obtrusive," although these assertions are a combination of opinion and convenience, rather than necessity. Aerial surveillance is not required by law.

Defendants use aerial surveillance to determine if nearby construction activity could damage the pipelines. They proffer no evidence that airplanes could not see construction equipment through the trees' branches, and they proffer no facts to demonstrate that land surveillance, in combination with the warning signs against construction on Fountain Avenue (required by law) and the Township's ability to regulate construction on its property, is ineffective to give them notice regarding safety and maintenance of the pipelines.

#### b. *Tree roots damaging the pipeline*

Defendants argue that the trees' roots may damage the pipelines by rubbing against them underground. Defendants' expert states that although tree roots normally stay near the surface, roots near pipelines can do "atypical things" because the excavation to put in the pipeline caused (a) greater moisture in the soil, (b) oxygenation of the soil, (c) less compacted soil, (d) deeper nutrients, and (e) because of heat emanating from the pipeline. Defendants also point out that "some varieties of trees have tap roots that grow deeper in the soil than the feeder roots," including some trees on Fountain Avenue. Defendants proffered no evidence during discovery that any of the tree roots that have been on Fountain Avenue for forty years are rubbing against the pipelines; have proffered no evidence as to how long after excavation the "atypical" root growth will continue; and no proffer of any test on the roots of the five trees that have recently been cut down on Fountain Avenue (with the consent of some residents) to determine if they had reached or were in fact rubbing against the pipeline.

#### c. *Accessing the pipelines in event of emergency*

Defendants argue that it is necessary to remove the trees in order to gain access to the pipelines in the event of emergency. They posit that the trees may be in the way of a vehicle getting to a particular location or a tree trunk/root may be in the way of access to a damaged part of the pipeline. No evidence has been proffered

---

7. Both parties agree that Defendants have a facility a few miles from Fountain Avenue.

8. Plaintiffs' expert report is not considered for purposes of this motion.

regarding what trees are currently in the way or that any such tree could not be quickly removed in the event of an emergency. As to the root structures themselves impeding emergency access, Defendants themselves propose to leave all the root structures in place after removing the trees and Defendants left the root structures in place of the five trees they recently removed.

### 3. Analysis

Defendants argue that for the above three reasons, they cannot enjoy their rights under the Easement to "operate," "inspect," or "maintain" the pipelines unless all the trees on Fountain Avenue are removed. They point to no particular tree or trees whose removal might alleviate their concern. As in *Hammett, Hyland,* and *Texas Eastern,* Defendants have not shown that other methods of enjoying their easement rights are ineffective. In *Hammett,* the Court found that the easement holder could alter the nearby roadway in order to access the pond's shore rather than creating a beach area. *Id.* at 426, 140 A.2d 377. In *Hyland,* the Court found that the easement holder could repair the servient roadway instead of blacktopping it. *Id.* at 191, 129 A.2d 899. In *Bowers,* the Court found that alternative methods of surveying the land for a pipe leak existed and the tree could be removed

upon discovery of an emergency. *Id.* at 794–96.

■ Here, Defendants have proffered no evidence, *inter alia,* that they cannot utilize land surveillance to observe the vegetation around the pipelines, that they cannot run the underground PIG device more frequently to check for pipe damage, or that the removal of only certain trees would not obviate their concerns. The evidence they do proffer is not related factually to the subject pipelines, although there was ample opportunity to do so. Defendants present evidence of tree roots damaging other pipelines,[9] and evidence that it is generally more difficult to aerially survey land and access pipelines with trees on the property. Plaintiffs proffer that the only evidence about the Fountain Avenue pipelines is that the PIG shows that the pipelines are damage-free, and aerial surveillance shows no foliage or discoloration indicative of a leak.

No evidence as been proffered as to why it has suddenly become necessary to remove Fountain Avenue's trees in 2000 in order to enjoy the Easement's terms. Defendants have complied with the law and exercised safety precautions for forty years since the pipelines were installed and the trees planted in 1963.[10] Defendants waited until April 2000 before first expressing inability to enjoy their easement rights.[11] As in *Hammett* and *Texas*

9. Defendants manage 17,500 miles of transmission pipelines. A few examples of this occurrence from pipelines across the country are insufficient to allow a reasonable fact finder to conclude by the preponderance of the evidence that the tree roots here, in an area that is one street block in length, are causing damage to the pipelines.

10. Defendants state only that their internal SOPs have changed and now go beyond legal safety requirements.

11. In denying Defendants' motion for preliminary injunction in 2002, Judge Wolin rea-

soned that "defendants have been effectively patrolling the pipelines for decades despite the presence of the trees. The Court sees no reason why defendants' usual surveillance techniques are suddenly ineffective. In addition, the defendants' delay in bringing this motion undermines their claim that they are motivated by urgent public safety concerns. Not only have defendants monitored the pipelines for decades despite the presence of the trees, but it has been two years since they informed the plaintiffs of their intention to remove the trees. Then, instead of moving upon two days notice to dissolve Judge Messina's injunction, defendants removed the case

*Eastern,* it is difficult to assert "reasonable necessity" to fundamentally alter a servient estate where years were allowed to pass under the status quo with no complaint regarding enjoyment of the easement. *See Hammett,* 26 N.J. at 425, 140 A.2d 377 (holding that since no easement holder had created a beach area for over 30 years in order to enjoy bathing benefits of pond, such creation was a matter of convenience and not necessity); *Texas Eastern,* 65 Fed.Appx. at 796 (holding that since the easement holder had effectively inspected the pipeline with the tree on the easement for many years, it was not reasonably necessary to remove the tree). If a factual proffer of actual danger had been made, it would be a very different story.

There must be real facts to support the safety argument before the fundamental alteration of Fountain Avenue's environment, destruction of the ecology, and reduction in Plaintiffs' property values are a reasonable necessity to ensure safety. As the trees are decades old, they are essentially irreplaceable. "These considerations are not necessarily decisive, but they are material." *Hyland* at 190–91, 129 A.2d 899 (reversing trial court in part because it was "unjustified" for trial court to ignore evidence of the negative effect from the easement holder's exercise of alleged rights on the plaintiff's property value and on the "nature and character of the plaintiff's property as a whole").

Plaintiffs are now on notice that these trees could, in the future, present a demonstrable safety risk sufficient to justify removal.[12] *See Hyland* at 191, 129 A.2d 899 (holding "we do not propose to decide in the present case when, if ever, the paving of this road against the will of the

servient owner will be lawful"). However, Defendants must first attempt to enjoy their easement rights in ways besides the one that they find most convenient to them, *see id.,* and must present the requisite evidence of reasonable necessity for the enjoyment of the Easement's terms. As the Third Circuit put it *Texas Eastern,* "Texas Eastern seeks to go beyond that judge-made standard [of reasonable necessity] to urge that all encroachments within that space must be removed because they interfered with the rights of the easement holder ... but if Texas Eastern had wanted such a bright-line rule that permitted of no exceptions ... it should have drafted the easement to say so. It did not." *Texas Eastern,* 65 Fed.Appx. at 794. The instant Easement likewise does not, particularly in the context of the 1963 Right of Way Instrument narrowing the Easement to permit residences and their attendant shade trees to be planted. If Defendants are able to one day produce evidence that they indeed cannot enjoy the terms of the Easement, they may apply for relief to an appropriate court.

## B. Laches

▉▉▉ Laches prevents a party from asserting a right where its delay in doing so is inexcusable and has prejudiced the party claiming the applicability of laches. *Santana Prods. v. Bobrick Washroom Equip., Inc.,* 401 F.3d 123, 138 (3d Cir. 2005). In determining whether a delay is inexcusable under the theory of laches, courts will consider and weigh (a) the length of the delay, (b) the reasons for the delay, and (c) any changed circumstances of either parties during the delay. *Lavin v. Board of Education of the City of Hack-*

---

to federal court and did not file the instant motion until five months later. These facts strongly suggest that there is no pressing public safety issue."

**12.** Thus, it might be prudent for Plaintiffs to plant trees on their own properties that will have time to grow in the event the London Plane and other trees do present a problem justifying removal.

**618**

*ensack,* 90 N.J. 145, 152–53, 447 A.2d 516 (1982).

Defendants do not dispute that in 1963 they, or their predecessors-in-title, knew that trees would be planted over the pipelines as part of the residential development and that they did not object to the planting of the trees. Rather Defendants waited nearly forty years to assert an alleged necessity to cut down trees. Defendants' explanation for this delay is that they have increased the stringency of their SOPs beyond that legally required by safety standards, an event completely within Defendants' control. Stringent procedures are laudable, but Defendants can produce equal results with ground surveillance as with aerial surveillance.

■ Because of the length of the Defendants' delay and Defendants' lack of justification or evidence regarding changed circumstances, this Court finds Defendants' delay inexcusable and prejudicial to Plaintiffs. Plaintiffs have made decisions to move to Fountain Avenue and to make improvements to their homes, based on the presence of the trees and their integration into the community. With advance notice, Plaintiffs could have changed their behavior by not investing in their homes, or by planting new trees on their own properties that could grow in order to make up in time for the subsequent removal of the large trees on the Easement.

Given their delay in asserting their concerns, Defendants would be wise to consider steps to mitigate the negative impact that the destruction of the trees would have on the community, should they ever adduce sufficient evidence that cutting down the trees is reasonably necessity to

enjoyment of the Easement.[13] While this Court does not reach beyond the issues presented to order future relief, the Court urges the parties to overcome their hostilities and prepare now for future eventualities, even if they never come to pass.

## CONCLUSION

IT IS on this 20th day of September 2005,

ORDERED that Plaintiffs' motion for summary judgment is GRANTED and Defendants' cross motion for summary judgment is DENIED; and it is further,

ORDERED that this case is CLOSED.[14]

---

13. For example, it might be wise for Defendants to offer to pay for the planting of new trees on Plaintiffs' properties to grow up well in advance of the need to cut down the mature trees.

14. This Court does not need to, and therefore does not, reach the summary judgment motion regarding the meaning of "cultivation" nor the 12(b)(6) motion to dismiss the nuisance cause of action.